UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LISA BURKETT SHORTES,           :
                                :CIVIL ACTION NO. 3:17-CV-616
          Plaintiff,            :
                                :(JUDGE CONABOY)
          v.                    :
                                :
NANCY A. BERRYHILL,             :
Acting Commissioner of          :
Social Security,                :
                                :
          Defendant.            :
                                :

---

**MEMORANDUM**

Pending before the Court is Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. (Doc. 1.) Plaintiff filed an application for benefits on November 18, 2013, alleging a disability onset date of September 26, 2013. (R. 18.) After she appealed the initial denial of the claim, a hearing was held on June 22, 2015, and Administrative Law Judge ("ALJ") Gerard Langan issued his Decision on October 1, 2015, concluding that Plaintiff had not been under a disability from the alleged onset date of September 26, 2013, through December 31, 2013, the date last insured. (R. 18, 27.) Plaintiff requested review of the ALJ's decision which the Appeals Council denied on February 6, 2017. (R. 1-6, 14.) In doing so, the ALJ's decision became the decision of the Acting Commissioner. (R. 1.)

Plaintiff filed this action on April 6, 2017. (Doc. 1.) She asserts in her supporting brief that the ALJ erred when he failed

to give controlling weight to the treating source's opinion.  (Doc. 8 at 4.)  After careful review of the record and the parties' filings, the Court concludes this appeal is properly granted.

## I. Background

Plaintiff was born on November 6, 1962, and was fifty-one years old on the date last insured.  (R. 26.)  She has a high school education and past relevant work as a home health aide, collection clerk, and fast food worker.  (*Id.*)

### A. Medical Evidence[1]

Plaintiff states that she alleged disability as of September 26, 2013, based on degenerative disc disease, herniated discs, a broken vertebrae in the thoracic spine, anxiety, and depression. (Doc. 8 at 2 (citing R. 158).)  Plaintiff said she was primarily treating with Dr. James Kim prior to her her date last insured of December 31, 2013.  (*Id.*)

Plaintiff first saw James B. Kim, D.O., of "Dr. Kim's Rehabilitation Office, LLC" on July 23, 2013.  (R. 295.)  Dr. Kim recorded that Plaintiff subjectively

> presented with complaints of right sided neck pains, right trapezius pains, shoulder pain and pain going down the right upper extremity causing weakness.  She states that this has been going on for about the past 2-1/2 weeks.
>
> She also complains of low back pains with pain down the right lower extremity . . .

---

[1]  The evidence review focuses on that relied upon by the parties and the ALJ.

2

> . . In the morning her leg feels like it's
> on fire. She has difficulty sleeping due to
> these pains. As far as . . . lumbar
> symptoms, she has had a history of lumbar
> injury from 2001 when she ended up with L3-
> L4-L5 HNP.

(*Id.*) Dr. Kim's mental status examination revealed no problems.

(R. 295.) His spinal examination showed tenderness and spasms in

the lumbar paraspinal musculature, tenderness and spasms in the

right trapezius region, the cervical paraspinal was "not that bad,"

flexion of the lumbar spine was 70 degrees, and hyperextension was

5 degrees past neutral. (R. 295-96.) Motor examination of the

upper extremities showed chest tenderness in the anterior and

lateral aspect of the right shoulder, full passive range of motion

in both shoulders, muscle strength 4+/5 for the right shoulder and

5/5 for the left shoulder, and bilateral elbow flexors/extensors

and bilateral grip were 5/5. (R. 296.) Motor examination of the

lower extremities showed normal muscle strength and tone, and

negative straight leg raising bilaterally to 70 degrees. (*Id.*) No

problems were noted with deep tendon reflexes, sensory responses,

or ambulation. (*Id.*) Dr. Kim's assessment included cervical

myofascial pains with right upper extremity radicular symptoms,

right shoulder rotator cuff tendinopathy, lumbar myofascial pains

with a history of lumbar HNP and right lower extremity radicular

symptoms, and depression. (*Id.*) His plan was to start Plaintiff

on Mobic after she completed a Medrol Dosepak "due to the severity

of the symptoms," and Neurontin for neuropathic pains. (*Id.*) Dr.

3

Kim referred Plaintiff to Physical Therapy and ordered diagnostic testing of the right shoulder and spine. (R. 297.)

At her August visit, Dr. Kim noted that physical therapy seemed to help and recorded that Plaintiff said she was getting more right trapezius pain after they had put a harness on her neck when she had the MRI. (R. 291.) Dr. Kim also noted that the MRI of the cervical spine showed multilevel disc osteophyte complex prominent at C4-C5 and C6-C7 with minimal borderline spinal stenosis, there appeared to be disc material which could represent extruded disc material but these were not acute findings, and foraminal stenosis was noted; MRI of the lumbar spine reportedly showed no spinal stenosis or foraminal stenosis but showed degenerative disc disease; and x-ray of the right shoulder was negative. (*Id.*) Spinal examination indicated tenderness and spasms in the lumbar paraspinal musculature, the right trapezius region, and the cervical paraspinal musculature. (R. 292.) Motor examination of the upper and lower extremities revealed no problems, and the gait analysis was also unremarkable. (R. 293.)

On September 24, 2013, Plaintiff reported to Dr. Kim that she still got neck and back pains and she had also noticed mid to low back pains which she said started a few days before and could have been attributed to twisting the wrong way. (R. 288.) Plaintiff continued to report that physical therapy helped. (*Id.*) Physical examination was much the same as the previous month but Plaintiff

4

also had tenderness and spasm in the lower thoracic region as well as the right lower ribs.  (R. 289.)  Plaintiff reported that she was having difficulty with her work which was in the kitchen so Dr. Kim noted that he would "hold her off work at least until next time I see her."  (R. 290.)

On October 8, 2013, Plaintiff complained of low back and neck pain as well as pain and numbness down the right lateral thigh and mid back pains going into the right ribs which increased with turning.  (R. 284.)  Dr. Kim noted that x-rays of the thoracic spine reportedly showed some degenerative changes and the right rib series was negative.  (*Id.*)  Spinal examination was much the same as at previous visits but Dr. Kim newly noted "[g]uarding hyperextension."  (R. 286.)  He ordered MRI of the thoracic spine. (*Id.*)

At her October 22nd visit, Dr. Kim recorded that the MRI showed "a small right paracentral disc protrusion at T9-T10 but it also showed edema at the anterior/superior endplate of T9 without loss of vertebral body height and this was suspicious for endplate fracture."  (R. 280.)  Physical examination findings were similar to those reported previously, but Dr. Kim additionally found tenderness in the left gluteal region.  (R. 282.)  Dr. Kim referred Plaintiff to orthopedist Dr. Allister Williams.  (R. 283.)

Plaintiff was seen by Anthony Blundetto, PA-C, at Mountain Valley Orthopedics for follow up on November 11, 2013.  (R. 348,

498.)  She rated her low back and right hip pain at 7/10 and reported five days of significant pain relief from the cortizone injection in her right hip which she received at her previous visit.  (*Id.*)  She also had a hyperextension brace for her T9 compression fracture.  (*Id.*)  Plaintiff was taking Celebrex daily, and she had been prescribed a lidoderm patch for her right hip pain.  (*Id.*)  Plaintiff reported numbness and tingling at the right ring and little fingers.  (*Id.*)  Examination included findings of 5/5 muscle strength in the upper and lower extremities, intact sensation to light touch, negative straight leg raise bilaterally, and moderate tenderness in the right hip trochanter.  (R. 499.) The diagnosis was T9 compression fracture, right hip greater trochanter bursitis, and right hand paresthesias.  (*Id.*)  Mr. Blundetto noted that he discussed the pathophysiology with Plaintiff and she wished to hold off on further management/intervention regarding her hand, she would continue using the brace, and she would follow up with Dr. Williams.  (*Id.*)

On November 26, 2013, Dr. Kim noted that Plaintiff was using a hyperextension back brace which she would be using for six weeks and then have a lighter one for another six weeks.  (R. 276.) Plaintiff said she still got pain down her legs which started in her back although she had been given a trochanteric bursa injection on the right.  (*Id.*)  Plaintiff said she also got right-sided rib pain, and she complained of headaches and depression.  (*Id.*)

6

Examination was much the same as previously assessed with an additional notation that the back brace fit well. (R. 278.) Dr. Kim noted that Plaintiff would continue with the use of back support and he planned to order a bone density scan to check for osteoporosis in light of her compresson fracture. (*Id.*)

On December 24, 2013, Plaintiff complained to Dr. Kim of low and mid back pain, neck pain, and right posterior thigh pain. (R. 368.) Dr. Kim noted that Plaintiff was being followed by Dr. Williams for spinal surgery and her brace had been changed, a Flector patch had been added to her medications, and she would be seeing neurology and clinical psychology for depression and headaches in the new year. (*Id.*) He also noted that Plaintiff had recently slipped on the ice but had not fallen. (*Id.*) Physical examination was much the same as previously assessed. (R. 370.) Dr. Kim advised Plaintiff to continue using the back brace and medications, and he stressed the importance of regular exercise. (*Id.*)

On January 29, 2014, Plaintiff returned to Dr. Kim for a follow up visit at which time he noted that Plaintiff had a fall on January 7, 2014, and she saw Dr. Williams on January 13, 2014. (R. 364.) Dr. Kim further noted that Plaintiff was to continue the back support/brace into the middle of February and then stop and Dr. Williams had advised that Plaintiff use a cane for safety which she had been doing. (*Id.*) Physical examination remained basically

the same.  (R. 366.)

July 17, 2014, records from Mountain Valley Orthopedics report that Plaintiff had a history of low back and right lower extremity pain which had been progressively worsening over the previous several months.  (R. 344.)  Plaintiff said she had tried physical therapy and behavior modification without relief of her symptoms, and she wanted to proceed with surgery.  (*Id.*)   The surgery,"TLIF L4-L5," was scheduled for July 29, 2014.  (*Id.*)  At the time Plaintiff's gait was mildly antalgic and she was using a cane.  (R. 346.)  Plaintiff's strength was 5 out of 5, she had positive tenderness to palpation over the facet joints bilaterally at L4-L5 and L5-S1 levels, she had pain in that region with hyperextension, and she had tenderdness to palpation at the greater trochanteric bursa of both hips.  (*Id.*)

**B.**    ***Opinion Evidence***

**1.**    <u>**Treating Physician**</u>

Dr. Kim completed a Medical Source Statement to Do Work-Related Activities form on December 10, 2013.  (R. 300-01.)  He opined that Plaintiff could sit for up to two hours, stand/walk for one hour, and she would have to change positions every ten minutes. (R. 300.)  Dr. Kim concluded that Plaintiff could rarely push and/or pull with upper and lower extremities, she could rarely reach in all directions, she could frequently handle, finger, and feel, her symptoms would frequently interfere with focus and

concentration, she needed to avoid several environmental
conditions, and she would need accommodations of as-needed
unscheduled breaks, walking breaks, and reclining breaks.  (*Id.*)
Dr. Kim noted that Plaintiff would likely miss work more than three
days per month due to her impairments or treatments.  (*Id.*)  He
identified "sleepiness" to be a response to treatment.  (*Id.*)  When
next asked to identify "objective findings, clinical observations,
and symptomatology supporting [his] assessment" (R. 301), he
responded "can get drowsiness."  (*Id.*)

## 2.   <u>State Agency Consulting Physician</u>

On January 24, 2014, Elizabeth Kamenar, M.D., completed a
Physical Residual Functional Capacity Assessment form based on a
review of Dr. Kim's December 2013 opinion and medical records
through October 19, 2013.  (R. 115-18.)  She indicated that the
assessment was for a date last insured of September 30, 2013.  (R.
115.)  Dr. Kamenar found that Plaintiff had the following
limitations: she could lift and/or carry twenty pounds occasionally
and ten pounds frequently, she could stand and/or walk for about
six hours in an eight-hour day and she could sit for the same
period of time, her abilities to push and pull were unlimited other
than what was identified for lift and/or carry, she could never
climb ladders/ropes/scaffolds, and she could occasionally climb
stairs, balance, stoop, kneel, crouch, and crawl.  (R. 116.)  Dr.
Kamenar also found that Plaintiff could occasionally reach overhead

on the right side and she had to avoid certain environmental conditions. (R. 117.) Under "RFC - Additional Explanation," Dr. Kamenar summarized Plaintiff's diagnosis, reviewed diagnostic testing done in August, September and October 2013, reviewed a September 24, 2013, follow up, and noted that there were no activities of daily living for the date last insured. (R. 117.)

*C. Hearing Testimony and Function Report*

### 1. Function Report

In her Function Report, Plaintiff indicated that her ability to work was limited due to the following: constant leg pain; an inability to lift more than a few pounds; lower and middle back pain; upper right neck pain; difficulty concentrating; and an inability to sit, stand, or walk for long periods. (R. 176.) She said that she was unable to do household chores as before and she did not sleep well because of pain but she was able to take care of her pets, do laundry, and heat up meals. (R. 176-77.) Plaintiff noted that she sometimes had problems with personal care due to difficulty bending and she never did yard work for the same reason. (R. 177, 179.) Plaintiff also said that she used to be very social but she did not go out sometimes because of pain. (R. 181.)

### 2. ALJ Hearing

At the June 22, 2015, hearing, Plaintiff testified that she stopped working as a cook in September 2013 when Dr. Kim "put [her] out of work" for a month because she "couldn't stand it anymore."

(R. 44.)  She said the food was too heavy to lift, her arm and leg gave out, and she couldn't stand.  (*Id.*)  Plaintiff noted that she experienced right leg, groin, and arm pain as well as back pain at the time.  (R. 44-45.)  Plaintiff testified that she had a hard time finding pain medication that agreed with her.  (R. 45.)  She estimated that, as of the date last insured, she could sit for an hour, stand for approximately one-half hour, and she was not able to lift "hardly anything."  (R. 51-53.)  Plaintiff also noted that she had pain when she tried to reach in front of her, and on a bad day (which related to weather and sleep), she could not reach at all.  (R. 60.)  She could not recall when she actually started to use a cane but said that Dr. Lozinger (her primary care provider), wanted her to use one before she began seeing Dr. Kim in July 2013. (R. 63.) When asked about a fall in January 2014, Plaintiff explained that she was walking down her porch steps and her right leg just gave out.  (R. 46.)

## D.    *ALJ Decision*

With his October 1, 2015, Decision, ALJ Langan determined that Plaintiff had the severe impairments of degenerative disc disease, lumbar radiculopathy, cervical degenerative disc disease, compression fracture of T9 vertebrae, right trochanter bursitis, and right shoulder tendinopathy.  (R. 20.)  He also found that Plaintiff had several non-severe impairments.  (R. 20-21.)  ALJ Langan concluded Plaintiff did not have an impairment or

combination of impairments that met or equaled a listing.   (R. 22.)

The ALJ concluded that through the date last insured Plaintiff had the residual functional capacity ("RFC") to perform light work with the following non-exertional limitations:

> the claimant had to avoid unprotected heights and moving machinery.  She could never climb ladders, ropes, or scaffolds, but could occasionally climb ramps and stairs making use of an assistive device to do so.  The claimant could only occasionally use her right upper extremity for overhead activity including lifting and reaching.  The claimant could only have occasional exposure to extreme cold temperatures, humidity, vibration, and environmental irritants (such as dust, fumes, odors and gases).  The claimant would have needed the opportunity to change position between sitting and standing every 30 minutes.

(R. 23.)  In explaining his RFC, ALJ Langan gave little weight to Dr. Kim's opinion because it was not supported by the evidence. (R. 25.)  He gave some weight to Dr. Kamenar's opinion, noting that it was supported by the evidence of record.  (*Id.*)

With this RFC, ALJ Langan concluded that Plaintiff was unable to perform past relevant work but jobs existed in significant numbers in the national economy that she could perform.  (R. 26.) He therefore found that Plaintiff had not been under a disability as defined in the Social Security Act, from September 26, 2013, through December 31, 2013, the date last insured.  (R. 27.)

Other relevant portions of the ALJ's Decision will be

12

referenced in the Discussion section of this Memorandum.

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[2] It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S.

---

[2] "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

13

521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs that existed in significant numbers in the national economy.  (R. 26-27.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence

14

as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion. *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted). The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the ALJ to analyze all probative evidence and set out the reasons for his decision. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000) (citations omitted). If he has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence

approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .")). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d

Cir. 1983) (internal quotation omitted). Where a claimed error would not affect the outcome of a case, remand is not required. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005). Finally, an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

Plaintiff asserts that the ALJ erred when he failed to give controlling weight to the treating source's opinion. (Doc. 8 at 4.) Defendant responds that substantial evidence supports the ALJ's finding that Dr. Kim's opinion was entitled to little weight. (Doc. 11 at 14.)

Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight. *See*, *e.g.*, *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)). Sometimes called the "treating physician rule," the principle is codified at 20 C.F.R. 404.1527(c)(2), and is widely accepted in the Third Circuit. *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986). The regulation addresses the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-

supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other

substantial evidence in your case, we will give it controlling

weight."  20 C.F.R. § 404.1527(c)(2).[3]  "A cardinal principle

guiding disability eligibility determinations is that the ALJ

accord treating physicians' reports great weight, especially when

their opinions reflect expert judgment based on continuing

observation of the patient's condition over a prolonged period of

---

[3] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

Generally, we give more weight to opinions from
your treating sources, since these sources are
likely to be the medical professionals most
able to provide a detailed, longitudinal
picture of your medical impairment(s) and may
bring a unique perspective to the medical
evidence that cannot be obtained from the
objective medical findings alone or from
reports of individual examinations, such as
consultative examinations or brief
hospitalizations. If we find that a treating
source's opinion on the issue(s) of the nature
and severity of your impairment(s) is well-
supported by medically acceptable clinical and
laboratory diagnostic techniques and is not
inconsistent with the other substantial
evidence in your case record, we will give it
controlling weight. When we do not give the
treating source's opinion controlling weight,
we apply the factors listed in paragraphs
(c)(2)(i) and (c)(2)(ii) of this section, as
well as the factors in paragraphs (c)(3)
through (c)(6) of this section in determining
the weight to give the opinion. We will always
give good reasons in our notice of
determination or decision for the weight we
give your treating source's opinion.

time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)

(citations omitted); *see also Brownawell v. Commissioner of Social*

*Security*, 554 F.3d 352, 355 (3d Cir. 2008). In choosing to reject

the treating physician's assessment, an ALJ may not make

"speculative inferences from medical reports and may reject a

treating physician's opinion outright only on the basis of

contradictory medical evidence and not due to his or her own

credibility judgments, speculation or lay opinion." *Morales*, 225

F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir.

1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

Pursuant to 20 C.F.R. § 404.1527(c)(2), an ALJ must assign

controlling weight to a well-supported treating medical source

opinion unless the ALJ identifies substantial inconsistent

evidence. SSR 96-2p explains terms used in 20 C.F.R. § 404.1527

regarding when treating source opinions are entitled to controlling

weight. 1996 WL 374188, at *1. For an opinion to be "well-

supported by medically acceptable clinical and laboratory

diagnostic techniques," 28 U.S.C. § 404.1527(c)(2), "it is not

necessary that the opinion be fully supported by such evidence"--it

is a fact-sensitive case-by-case determination. SSR 96-2p, at *2.

ALJ Langan reviewed Dr. Kim's opinion and concluded that his

records did not support the degree of limitation assessed,

explaining that

> the treatment notes show that while she had
> some tenderness and spasm in the lumbar,

19

> thoracic, anc cervical region, the claimant
> had full muscle strength in the upper and
> lower extremities, had negative straight leg
> raise, and was able to ambulate independently
> without an assistive device (Exhibits
> 4F/pp.4, 8, 12; 10F/22). Because the
> evidence does not support this opinion, the
> undersigned gives it little weight.

(R. 25.) In contrast, he gave some weight to Dr. Kamenar's opinion that Plaintiff was able to do a range of light work because it was supported by the evidence of record. (*Id.*)

In his review of evidence, ALJ Langan characterized radiological evidence before December 31, 2013, as having revealed "mild results." (*Id.*) As argued by Plaintiff, this is lay interpretation of evidence, particularly in that Plaintiff was treated by an orthopedist for problems including the thoracic compression fracture and she was prescribed a brace which was expected to be worn for approximately three months. (*See* R. 276.) Furthermore, the ALJ does not discuss why consistent physical examination reports of tenderness and spasm in the lumbar paraspinal, right trapezius, cervical paraspinal, and lower thoracic regions, as well periodic similar findings related to the right lower ribs and gluteal region (*see* R. 278, 282, 286, 370) do not constitute objective medical evidence supporting the limitations assessed. Notably, when Dr. Kim began seeing Plaintiff in July 2013, his initial treatment plan was based on "the severity of Plaintiff's symptoms." (R. 296.) Further, Dr. Kim noted in December 2013 that Plaintiff was seeing Dr. Williams for ongoing

treatment of her thoracic compression fracture and consideration of spinal surgery. (R. 368.) This notation of the potential for the need for surgical intervention supports the ongoing nature of Plaintiff's back problems and arguably supports a condition which was worsening before the date last insured.[4]

The ALJ reviews some normal clinical findings in his RFC explanation (R. 25) and Defendant cites these and similar findings as substantial evidences supporting the ALJ's opinion assessment (*see* Doc. 11 at 16). However, these normal findings do not necessarily contradict the objective supporting evidence noted above--evidence which could not be discounted without citation to contradictory evidence. *See*, *e.g.*, Morales, 225 F.3d at 317. While Defendant is correct that the normal findings are not "inconsistent with light work" (*id.*), this fact does not equate with a conclusion that objective findings, including spasm and tenderness, are consistent with light work when Plaintiff's testimony about the limiting effects of her symptoms are properly considered.

Because the ALJ did not adequately discuss evidence of record supporting Dr. Kim's opinion, the Court cannot say that his finding that it was entitled to little weight is based on substantial

---

[4]  Although the form opinion completed by Dr. Kim did not request durational information (*see* R. 300-01), such evidence would be relevant given arguably deteriorating back problems and the evidence from early January 2014 (R. 364, 366) which may present not unexpected problems related to pre date-last-insured impairment functional difficulties.

evidence.  This conclusion is bolstered by the fact it is the *only* opinion of record which addressed the relevant time period: Dr. Kamenar's assessment addresses the RFC for a date last insured of September 30, 2013, (R. 115; *see also* R. 117) and, therefore, did not consider relevant evidence including Plaintiff's condition through December 2013, her treatment with Dr. Williams, or her testimony about events occurring one week after her date last insured.  Contrary to Defendant's assertion that "Dr. Kamenar's opinion demonstrates that Dr. Kim's opinion was not consistent with the record as a whole . . . and [Dr. Kamenar's] opinion was based on a review of a significant part of the relevant evidence" (Doc. 11 at 19), Dr. Kamenar's failure to address evidence through the date last insured of December 31, 2013, (and immediately thereafter) as relevant is significant given the limited duration of the time period at issue in this case.  Reliance on such a decision is not consistent with decisions of this Court.  *See*, *e.g.*, *Carver v. Colvin*, Civ. A. No. 1:15-CV-0634, 2016 WL 6582060 (M.D. Pa. Nov. 7, 2016).

Because the Court cannot conclude the ALJ's assessment of Dr. Kim's opinion is based on substantial evidence, this case must be remanded for further consideration.  Proper consideration may entail development of the record regarding Plaintiff's prognosis as of the date last insured and clarification from Dr. Kim about the

basis for his assessed limitations.[5]

## **V. Conclusion**

For the reasons discussed above, Plaintiff's appeal is properly granted and this matter is remanded to the Acting Commissioner for further consideration.  An appropriate Order is filed simultaneously with this Memorandum.


                                    S/Richard P. Conaboy
                                    RICHARD P. CONABOY
                                    United States District Judge

DATED: November 1, 2017

---

[5]  The need for clarification of the basis for assessed limitations is due in part to certain responses found in the Medical Source Statement completed by Dr. Kim.  (R. 300-01.) Specifically, as set out in the Background section of the Memorandum, Dr. Kim identified "sleepiness" to be a response to treatment.  (R. 301.)  When next asked to identify "objective findings, clinical observations, and symptomatology supporting [his] assessment," he responded "can get drowsiness."  (*Id.*) This response suggests that Dr. Kim may have related the request for objective findings, clinical observations, and symptomatology supporting [his] assessment" (R. 301) as relevant only to the preceding inquiry regarding responses to treatment (*id.*).